**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ASHTON ORR, ZAYA PERYSIAN, SAWYER SOE, CHASTAIN ANDERSON, DREW HALL, BELLA BOE, and REID SOLOMON-LANE, on behalf of themselves and others similarly situated, )<br><br>Plaintiffs, )<br><br>v. )<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; and UNITED STATES OF AMERICA, )<br><br>Defendants. ) | No. 1:25-cv-10313-JEK |

**MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION TO STAY AGENCY ACTION AND FOR PRELIMINARY INJUNCTION**

**KOBICK, J.**

For over thirty years, transgender Americans have been able to obtain a passport from the Department of State that reflects their gender identity rather than the sex they were assigned at birth. Initially, from 1992 to 2010, an applicant had to submit evidence of surgical reassignment to obtain such a passport. In a revised policy adopted in 2010, the State Department required transgender applicants to submit only a certification from a physician that they were receiving appropriate clinical treatment for gender transition to receive such a passport. And in 2021, the State Department again revised its policy to allow transgender applicants to receive a passport with a sex marker reflective of their gender identity without medical documentation, and to further

allow intersex, non-binary, and gender non-conforming applicants to select "X" as their sex marker rather than an "M" for male or an "F" for female.

On January 20, 2025, President Trump signed Executive Order 14168, which declares that "[i]t is the policy of the United States to recognize two sexes, male and female," with the terms "male" and "female" defined to mean "a person belonging, at conception, to the sex that produces the [small and] large reproductive cell[s]," respectively. The order asserts that it is a "false claim that males can identify as and thus become women and vice versa," and states that a person's gender identity "does not provide a meaningful basis for identification." The order directed the Secretary of State to make "changes to require that government-issued identification documents, including passports . . . accurately reflect the holder's sex," as that term is defined in the order. In late January 2025, to comply with the Executive Order's directive, the State Department made two substantive changes to its prior passport policy. First, it withdrew the option for Americans to obtain a passport reflective of either their gender identity or their sex assigned at birth, and instead required all passports to reflect only applicants' sex assigned at birth. Second, it removed the option for intersex, non-binary, and gender non-conforming applicants to select "X" as the sex marker on their passports. This Memorandum and Order refers to these changes as the "Passport Policy."

The plaintiffs—seven transgender or non-binary Americans—brought this lawsuit to challenge Executive Order 14168 and the State Department's Passport Policy. They claim that the Executive Order and Passport Policy offend the equal protection principles safeguarded by the Fifth Amendment to the United States Constitution, and further violate the Fifth Amendment rights to international travel and informational privacy. The plaintiffs also contend that the Passport Policy runs afoul of the Administrative Procedure Act because it is arbitrary and capricious and was adopted without complying with the procedural requirements of the Paperwork Reduction

Act. Pending before the Court is the plaintiffs' motion to stay the Passport Policy or for a preliminary injunction.

The plaintiffs have made a substantial showing that they are likely to succeed on the merits of their equal protection claim. The Executive Order and the Passport Policy on their face classify passport applicants on the basis of sex and thus must be reviewed under intermediate judicial scrutiny. That standard requires the government to demonstrate that its actions are substantially related to an important governmental interest. The government has failed to meet this standard. It does not defend its actions based on the express purposes set forth in the Executive Order, and it has not substantiated, with evidence or developed argument, its claim that its facially discriminatory policies bear a substantial relationship to an interest in maintaining uniform data on sex across government agencies. The plaintiffs have also demonstrated a likelihood of success on their separate argument that, under any standard of review, the Executive Order and Passport Policy are based on irrational prejudice toward transgender Americans and therefore offend our Nation's constitutional commitment to equal protection for all Americans. In addition, the plaintiffs have shown that they are likely to succeed on their claim that the Passport Policy is arbitrary and capricious, and that it was not adopted in compliance with the procedures required by the Paperwork Reduction Act and Administrative Procedure Act.

Six of the seven plaintiffs have demonstrated that they are likely to suffer irreparable harm if the Passport Policy is not enjoined pending full adjudication on the merits of this lawsuit. The balance of the equities and public interest strongly favor entering an injunction as to these plaintiffs. The Court will therefore grant the request for a preliminary injunction as to these plaintiffs, but will deny the plaintiffs' further request for a stay of the Passport Policy under 5

U.S.C. § 705, because, as formulated, their request exceeds the scope of relief made available under that statute.

## BACKGROUND

### I. **Statutory and Regulatory Framework.**

#### A. General Background.

A United States passport is a "travel document . . . issued under the authority of the Secretary of State attesting to the identity and nationality of the bearer." 22 C.F.R. § 51.1. The Secretary of State grants and issues passports to United States citizens "under such rules as the President shall designate and prescribe." 22 U.S.C. § 211a. To obtain a passport, an individual must "submit a written application which shall contain a true recital of each and every matter of fact which may be required by law or by any rules authorized by law to be stated as a prerequisite to the issuance of any such passport." *Id.* § 213. First-time passport applicants must submit a Form DS-11, applicants seeking to renew their passport must submit a Form DS-82, and certain applicants seeking to change their name or correct identifying information must submit a Form DS-5504 (collectively, the "passport forms"). *See* ECF 53-1, ¶ 3; 22 C.F.R. § 51.20(a). A passport applicant has the burden of establishing, among other things, their identity, 22 C.F.R. § 51.23(a), and that they are a U.S. citizen or non-citizen national, *id.* § 51.40. It is a crime to "willfully and knowingly" make a false statement in a passport application "with intent to induce or secure the issuance of a passport." 18 U.S.C. § 1542.

#### B. Passport Sex Markers: 1976-2024.

Passports have been issued "since the earliest days of the Republic." *Haig v. Agee*, 453 U.S. 280, 293 (1981). For most of the country's history, however, American citizens have been permitted to travel abroad without a passport. *See Kent v. Dulles*, 357 U.S. 116, 121 (1958). Indeed,

American citizens could travel anywhere in the western hemisphere without a passport before 1961. *See Zemel v. Rusk*, 381 U.S. 1, 3 (1965). Not until 1978 did Congress enact a statute, 8 U.S.C. § 1185, declaring it unlawful for an American citizen to enter or depart from the United States without a valid passport. *See Agee*, 453 U.S. at 300 & n.47; 8 U.S.C. § 1185(b).

Two years earlier, in 1976, the State Department first "introduced sex as a required identity attribute" on passports, instructing applicants to indicate their sex as either male ("M") or female ("F"). ECF 53-1, ¶ 5. In 1992, the State Department began permitting applicants to select a sex marker that differed from their sex assigned at birth. *See id.* ¶ 6. Applicants were initially required to submit "evidence of surgical reassignment" to change their sex marker, but the State Department eliminated this requirement in 2010, when it began accepting "a physician's certification that the applicant had had appropriate clinical treatment for gender transition." *Id.* In 2021, it further revised its policy concerning passport markers, making two substantive changes: (1) applicants would be allowed to self-select their sex marker based on their gender identity; and (2) non-binary, intersex, and gender non-conforming applicants would be permitted to select a third sex marker, "X," in lieu of an "M" or "F" marker. *See id.* ¶¶ 7-8. The State Department also began using the term "gender" instead of "sex" on the passport forms, though it continued to use the term "sex" on passports it issued. *See id.*

The State Department updated the passport forms to reflect these changes and, in accordance with the Paperwork Reduction Act, published 60-day comment notices regarding these changes in the Federal Register. *See* 86 Fed. Reg. 51257 (Sept. 15, 2021), at 51434 (Form DS-82), 51434 (Form DS-5504), and 51435 (Form DS-11). The notices stated: "The Department's new policy permits passport applicants to select the gender marker on their passport without presenting medical documentation of gender transition. This policy change includes updating forms to add a

third gender marker 'X' for applicants identifying as non-binary, intersex, and/or gender non-conforming (in addition to the existing 'M' and 'F' gender markers)." *Id.* at 51434, 51435. The State Department began using the revised passport forms in April 2022, after receiving approval from the Office of Management and Budget ("OMB"). ECF 53-1, ¶ 8. In November 2024, the State Department issued 60-day comment notices requesting that OMB renew the forms, which are scheduled to expire on April 30, 2025. *See id.* ¶¶ 8-9; 89 Fed. Reg. 93389 (Nov. 26, 2024), at 93389 (Form DS-11), 93390 (Form DS-82); 89 Fed. Reg. 94867 (Nov. 29, 2024) (Form DS-5504).

C.    Executive Order 14168.

On January 20, 2025, President Trump signed Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (the "Executive Order" or "EO"). 90 Fed. Reg. 8615 (Jan. 20, 2025). The first section, titled "Purpose," asserts that "ideologues" are engaged in a protracted effort to undermine "the biological reality of sex" to the detriment of "women." EO § 1. The first two paragraphs of this section read in full:

> Across the country, ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers. This is wrong. Efforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well-being. The erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system. Basing Federal policy on truth is critical to scientific inquiry, public safety, morale, and trust in government itself.

> This unhealthy road is paved by an ongoing and purposeful attack against the ordinary and longstanding use and understanding of biological and scientific terms, replacing the immutable biological reality of sex with an internal, fluid, and subjective sense of self unmoored from biological facts. Invalidating the true and biological category of "woman" improperly transforms laws and policies designed to protect sex-based opportunities into laws and policies that undermine them,

6

replacing longstanding, cherished legal rights and values with an identity-based, inchoate social concept.

*Id.* Based on these premises, the Executive Order states that the Trump Administration will "recognize women are biologically female, and men are biologically male." *Id.*

In view of these purposes, the Executive Order asserts that "[i]t is the policy of the United States to recognize two sexes, male and female," which "are not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2. It then sets forth the following definitions:

(a) "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."

(b) "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.

(c) "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.

(d) "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

(e) "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

(f) "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

(g) "Gender identity" reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

*Id.*

The Executive Order requires federal agencies to use the term "sex" instead of "gender" in all federal policies and documents when "administering or enforcing sex-based distinctions." *Id.* § 3(c). Accordingly, it directs the "Secretaries of State and Homeland Security, and the Director of the Office of Personnel Management, [to] implement changes to require that government-issued

identification documents, including passports . . . accurately reflect the holder's sex," as that term is defined in the Executive Order. *Id.* § 3(d). It further directs the Secretary of Health and Human Services ("HHS") to develop "clear guidance" expanding on the definitions set forth in the Executive Order. *Id.* § 3(a).

In accordance with the Executive Order, HHS released a document defining "sex" and related terms on February 19, 2025. *See* Dep't of Health & Hum. Servs., *Defining Sex: Guidance for Federal Agencies, External Partners, and the Public Implementing Executive Order 14168* (Feb. 19, 2025).[1] HHS defines "sex" as "a person's immutable biological classification as either male or female"; it defines "female" as "a person of the sex characterized by a reproductive system with the biological function of producing eggs (ova)"; and it defines "male" as "a person of the sex characterized by a reproductive system with the biological function of producing sperm." *Id.* at 2.

    D.    <u>The Passport Policy.</u>

Pursuant to the Executive Order, the State Department made two substantive changes to its prior passport policy: (1) it removed the option for applicants to obtain a passport with a sex marker reflecting either their gender identity or sex assigned at birth, and replaced it with the requirement that a passport must reflect an applicant's sex assigned at birth; and (2) it removed the option for non-binary, intersex, or gender non-conforming applicants to obtain a passport with an "X" sex marker. *See* ECF 53-1, ¶¶ 15, 20-21. On January 22, 2025, two days after the Executive Order was issued, the State Department informed all domestic passport agencies of these changes. *See id.* ¶ 15. The same instructions were issued to all diplomatic posts abroad the following day. *Id.*

---

[1] *See* https://perma.cc/N5V8-CHEC.

In late January 2025, the State Department replaced the passport forms available on its website, which offered an "X" sex marker, with earlier versions of the forms, which offered only "M" and "F" sex markers. *See id.* ¶ 17.[2] In mid-February 2025, the State Department issued 30-day comment notices indicating that, in accordance with Executive Order 14168, it had updated the passport forms to: (1) "replace the term 'gender' with 'sex'"; (2) "request the applicant's biological sex at birth," rather than permitting applicants to self-identify their sex; and (3) offer only "M" and "F" sex markers. 90 Fed. Reg. 9652 (Feb. 14, 2025) (Form DS-11); 90 Fed. Reg. 9800, 9800-01 (Feb. 18, 2025) (Forms DS-82 and DS-5400); *see* ECF 53-1, ¶ 20.

Because the State Department "does not have the capacity to adjudicate 'sex at conception,'" it relies on HHS's definitions of "male" and "female," rather than the Executive Order's definitions of these terms. ECF 53-1, ¶¶ 14, 21. The State Department asserts that the determination of an applicant's sex assigned at birth "can generally be adjudicated using a birth certificate," *id.* ¶ 18, but the Department may also conduct further investigation into an applicant's sex assigned at birth by looking to other documents or by calling the applicant, *see* ECF 30-4, ¶ 12.

## II.     **Factual Background.**

The following facts, which are undisputed, are drawn from the complaint, as well as affidavits and expert declarations submitted by the plaintiffs.

The plaintiffs are seven transgender or non-binary American citizens. ECF 1, ¶¶ 9, 16-22. The term "transgender" refers to individuals whose gender identity differs from the sex they were assigned at birth. ECF 30-1, ¶ 46. The term "non-binary" refers to individuals whose gender

---

[2] The following statement, titled "2025 Notice," is currently posted on the "Passport Forms" page of the State Department's website: "You may use all forms available on our site, including ones that expired before 2025. We are currently working to update our forms and will post the new versions as soon as they are available." U.S. Dep't of State, Bureau of Consular Affs., *Passport Forms* (last visited Apr. 18, 2025), https://perma.cc/27FP-2R9F.

identity is neither exclusively male nor exclusively female. *Id.* ¶ 49. Non-binary people are, according to the plaintiffs, a subset of transgender people because their gender identity does not match their sex assigned at birth. *See* ECF 65, at 18. An individual's sex is typically assigned at birth based on the appearance of their external genitalia. *See* ECF 30-1, ¶ 47.

Many transgender and non-binary people experience gender dysphoria, a medical condition defined as "the significant emotional distress or impairment in social, occupational, or other important areas of functioning that stems from the incongruence between a person's gender identity and sex designated at birth, and/or body characteristics." *Id.* ¶ 53. Gender dysphoria is a recognized diagnosis by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, and it can be effectively managed when appropriately treated. *Id.* ¶¶ 54, 56. Treatment protocols for gender dysphoria are detailed in two leading evidence-based clinical guidelines: the Endocrine Society Clinical Practice Guideline for Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons, and the World Professional Association for Transgender Health Standards of Care for the Health of Transgender and Gender Diverse People. *Id.* ¶ 57. These guidelines reflect professional consensus about the psychological, psychiatric, hormonal, and surgical management of gender dysphoria, and they are supported by all major American medical associations. *Id.* The recognized standard of care for gender dysphoria consists of individualized treatment designed "to bring a person's body and expression of their sex in line with their gender identity." *Id.* ¶ 58. Such treatment is multimodal and may involve, among other things, social transition, hormone treatment, and gender-affirming surgeries. *See id.* ¶ 59. Social transition entails "living one's life consistently with one's gender identity, including using identity documents that reflect one's gender identity." *Id.* ¶ 77.

Plaintiffs Zaya Perysian, Chastain Anderson, and Bella Boe[3] are transgender women whose sex assigned at birth was male. ECF 30-3, ¶ 4; ECF 30-6, ¶ 5; *see* ECF 30-5, ¶ 5. Each has a driver's license with a female sex marker, and Boe previously obtained a passport with a female sex marker. ECF 30-3, ¶ 9; ECF 30-5, ¶¶ 7, 13; ECF 30-6, ¶ 10. Anderson and Perysian submitted expedited applications to renew their passports and obtain female sex markers on December 27, 2024 and January 23, 2025, respectively. ECF 30-3, ¶ 10; ECF 30-6, ¶ 10. They have received their renewed passports, but the passports bear male sex markers, rather than the female sex markers that they requested. ECF 30-3, ¶ 12; ECF 30-6, ¶ 11. Boe also applied to renew her passport on January 25, 2025, but as of the date of her declaration, she had not received a new passport. ECF 30-5, ¶ 13.

Plaintiffs Ashton Orr and Reid Solomon-Lane are transgender men whose sex assigned at birth was female. ECF 30-4, ¶ 5; ECF 30-8, ¶ 5. Each has a driver's license with a male sex marker, and Solomon-Lane's current passport also has a male sex marker. ECF 30-4, ¶ 8; ECF 30-8, ¶¶ 10-11. On January 16, 2025, Orr submitted an expedited application to renew his passport and obtain a male sex marker. ECF 30-4, ¶ 12. However, on February 11, 2025, a representative from the State Department called him to investigate his sex assigned at birth. *Id.* That representative informed Orr that, pursuant to the Executive Order, the State Department would only issue him a passport with a female sex marker. *Id.* He was given the opportunity to withdraw his renewal application and have his current passport, which has a female sex marker, returned to him. *Id.* Later that day, Orr received an email from the State Department informing him that his application is "on hold" until he provides "additional information" to complete his application. *Id.* at 7. Solomon-Lane has

---

[3] The Court allowed plaintiffs Bella Boe and Sawyer Soe's unopposed motion to proceed under pseudonym on March 18, 2025. ECF 60.

not attempted to renew his passport, which will expire in 2028, nor has he expressed an intention to do so. *See* ECF 30-8, ¶ 11.

      Plaintiff Drew Hall is a non-binary person who expresses themselves in a feminine manner and whose sex assigned at birth was male. ECF 30-7, ¶¶ 5, 7. They have a driver's license and social security card with a female sex marker. *Id.* ¶ 10. On January 9, 2025, Hall applied to renew their passport and obtain an updated sex marker, and they received an email informing them that their application had been approved on February 11, 2025. *See id.* ¶ 12. As of the date of their declaration, they had not received their new passport, however, and they do not know what sex marker will be listed on it. *Id.* Plaintiff Sawyer Soe is also non-binary, and they feel that this term accurately captures their gender because it encompasses both masculine and feminine expression. ECF 30-9, ¶ 5. Their sex assigned at birth was female, and their previous passport, which expired in August 2019, had a female sex marker. *Id.* ¶¶ 5, 9. Soe has obtained a driver's license with an "X" sex marker, and they hope to also obtain a passport with an "X" marker. *Id.* ¶¶ 8, 11. They have not yet applied to renew their passport, but they will be required to travel internationally within the next two months. *See id.* ¶ 10.

      Each of the plaintiffs would fear for their safety if required to travel with a passport bearing a sex marker that corresponds to their sex assigned at birth, rather than to their gender identity and expression. *See* ECF 30-3, ¶¶ 14-15; ECF 30-4, ¶ 15; ECF 30-5, ¶¶ 13-14; ECF 30-6, ¶¶ 12-13; ECF 30-7, ¶¶ 14-15; ECF 30-8, ¶¶ 11-12; ECF 30-9, ¶ 11. Three plaintiffs—Orr, Anderson, and Perysian—previously faced harassment or discrimination when travelling with identity documents bearing a sex marker corresponding to their sex assigned at birth rather than their gender identity. ECF 30-3, ¶ 8; ECF 30-4, ¶ 10; ECF 30-6, ¶ 13. In January 2025, a Transportation Security Administration ("TSA") officer accused Orr of presenting a false identification document when he

flew from West Virginia to New York, because the male sex marker on his driver's license did not match the female sex marker on his passport. ECF 30-4, ¶ 10. Similarly, in 2017, TSA agents pulled Anderson aside when she presented a driver's license with a male sex marker at an airport security checkpoint in Richmond, Virginia. ECF 30-6, ¶ 13. Anderson was isolated in a cubicle, where she waited for thirty minutes until a manager came in and performed a strip search of her body. *Id.* Perysian avers that before updating her driver's license, she was patted down by TSA agents who sought to confirm her gender after observing the disjunction between her female gender expression and the male sex marker on her identity documents. *See* ECF 30-3, ¶ 8. These experiences were "devastating" for Perysian, and they have occurred less frequently since she obtained a driver's license with a female sex marker. *See id.*

Each of the plaintiffs has, or until recently had, plans to travel internationally in 2025. Perysian, Orr, and Boe had planned to go on international trips in February and March of 2025, but they cancelled their respective trips because they were unable to obtain passports with sex markers matching their gender identities and other identity documents. *See* ECF 65, 27:23-28:12; ECF 30-4, ¶¶ 13-14; ECF 30-5, ¶¶ 9, 13-14; ECF 30-3, ¶¶ 10, 14. Soe, who works for a video game developer with a global presence, plans to travel internationally for work within the next three months, and Anderson has plans to attend a professional conference in France in October 2025. *See* ECF 30-9, ¶¶ 4, 10; ECF 30-6, ¶ 9. Hall, who is pursuing a Ph.D. at the University of British Columbia, travels between Canada and the United States several times a year, and they plan to travel to Wisconsin in May for a wedding and in July for an academic conference. ECF 30-7, ¶¶ 4, 9. Solomon-Lane plans to visit Montreal within the next year to visit friends, and he frequently travels internationally to visit his mother-in-law, who owns a home in Ireland. ECF 30-8, ¶ 9.

III.    **Procedural History.**

The plaintiffs filed their putative class action complaint on February 7, 2025, naming as defendants Donald J. Trump, in his official capacity as President of the United States; the United States of America; Marco Rubio, in his official capacity as Secretary of State; and the Department of State. ECF 1. They intend to seek certification of the following classes of individuals under Federal Rule of Civil Procedure 23:

a.  All people who currently want, or in the future will want, to apply for, apply to renew, or apply to change a U.S. passport and wish to use an "M" or "F" sex designation on their passport that aligns with their gender identity but does not match how the Executive Order defines their sex; and

b.  All people who currently want, or in the future will want, to apply for, apply to renew, or apply to change a U.S. passport and wish to use an "X" sex designation.

ECF 1, ¶ 185.

Against all defendants, the complaint asserts claims for discrimination based on sex and transgender status, in violation of the Fifth Amendment, *id.* ¶¶ 193-211 (Count 1); infringement of the Fifth Amendment right to travel abroad, *id.* ¶¶ 212-20 (Count 2); infringement of the Fifth Amendment right to privacy, *id.* ¶¶ 221-27 (Count 3); and a violation of the First Amendment right to free speech and expression, *id.* ¶¶ 228-35 (Count 4). Against Secretary Rubio and the State Department (the "Agency Defendants"), the complaint asserts three claims for violations of the Administrative Procedure Act ("APA"). It alleges that the Passport Policy and related agency actions violate the APA because they are "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), ECF 1, ¶¶ 236-39 (Count 5); arbitrary and capricious, 5 U.S.C. § 706(2)(A), ECF 1, ¶¶ 240-46 (Count 6); and without observance of procedure required by the Paperwork Reduction Act, 5 U.S.C. § 706(2)(D), ECF 1, ¶¶ 247-51 (Count 7). The complaint seeks, among other things, declaratory judgment that the Passport Policy and Executive Order

violate the plaintiffs' constitutional rights and that the Passport Policy violates the APA; and an injunction that prevents the defendants from enforcing the Passport Policy or Executive Order, insofar as it applies to passports, and requires the defendants to permit applicants to self-attest to their sex and have the ability to select an "X" sex marker. *See* ECF 1, at 56-57.

On February 18, 2025, the plaintiffs filed a motion to stay agency action and for a preliminary injunction. ECF 29. In support of their motion, the plaintiffs submitted, among other things, a memorandum of law, ECF 30; the declaration of Sarah D. Corathers, MD, the Clinical Director of the Division of Pediatric Endocrinology at Cincinnati Children's Hospital, ECF 30-1; the declaration of Ayden Scheim, Ph.D., an Assistant Professor of Epidemiology and Biostatistics in the Dornsife School of Public Health at Drexel University, ECF 30-2; and declarations filed by each of the named plaintiffs, ECF 30-3 to 30-9.[4] Pursuant to 5 U.S.C. § 705, the plaintiffs ask the Court to stay enforcement of the Passport Policy during the pendency of this litigation and to require the defendants to issue passports consistent with the prior passport policy. *See* ECF 29, at 1-2. Pursuant to Federal Rule of Civil Procedure 65(a), the plaintiffs ask the Court to enjoin the Agency Defendants from enforcing the Passport Policy against them during the pendency of this litigation. *Id.* at 2. They also ask for an order requiring the State Department to process and issue passports to them in accordance with its prior passport policy. *See id.* After receiving the government's opposition, ECF 53, which included a declaration submitted by Matthew Pierce, the Deputy Assistant Secretary for Passport Services in the Bureau of Consular Affairs at the State Department, ECF 53-1, and the plaintiffs' reply, ECF 62, the Court held a hearing and took the

---

[4] The plaintiffs contend in their motion that they are likely to succeed on the merits of Counts 1, 2, 3, 6, and 7 of their complaint, but did not move on Counts 4 and 5.

motion under advisement, ECF 64. The parties submitted supplemental briefs regarding the plaintiffs' request for a stay after the hearing. ECF 67-1, 69.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy . . . that is never awarded as of right." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quotation marks and citations omitted). To secure a preliminary injunction, the plaintiffs must demonstrate: "'(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest.'" *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (quoting *Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003)). The first and second factors are "the most important," *González-Droz v. González-Colon*, 573 F.3d 75, 79 (1st Cir. 2009), and courts consider them in tandem, *see Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## DISCUSSION

I.   **Likelihood of Success on the Merits.**

A.   Equal Protection Claim.

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Implicit in this provision is a guarantee of equal protection of the laws. *See Sessions v. Morales-Santana*, 582 U.S. 47, 52 & n.1 (2017); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 231-32 (1995). Courts analyze Fifth Amendment equal protection claims against the federal government in "'precisely the same'" manner as Fourteenth Amendment equal protection claims against state and

16

local governments. *Morales-Santana*, 582 U.S. at 52 n.1 (quoting *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975)).

The plaintiffs claim that Executive Order 14168 and the Passport Policy deprive them of their guarantee of equal protection by discriminating against them on the basis of sex and on the basis of transgender status without adequate justification. They further contend that the Executive Order and Passport Policy spring from unlawful animus toward transgender individuals. The government disagrees, contending that the Executive Order and Passport Policy do not classify on the basis of sex or transgender status, lack indicia of animus toward transgender people, and must be upheld under rational basis review.

       1.   *Level of Scrutiny.*

The plaintiffs first contend that the Passport Policy discriminates against them on the basis of sex. Laws, governmental policies, or executive orders that expressly classify on the basis of sex or gender are subject to heightened judicial scrutiny. *See Morales-Santana*, 582 U.S. at 58 ("Laws granting or denying benefits 'on the basis of . . . sex' . . . differentiate on the basis of gender, and therefore attract heightened review under the Constitution's equal protection guarantee." (quoting *Califano v. Westcott*, 443 U.S. 76, 84 (1979))). To sustain the constitutionality of such policies, the government must advance an "'exceedingly persuasive justification,'" demonstrating that the classification "'serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Id.* at 58-59 (quoting *United States v. Virginia*, 518 U.S. 515, 531, 533 (1996) ("*VMI*")). "[C]lassifications based on gender" and sex call for this intermediate standard of scrutiny because a person's gender and sex "generally provid[e] no sensible ground for differential treatment." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985).

The State Department's Passport Policy made two substantive changes to its prior policy: (1) where it once allowed applicants to obtain a passport with a sex marker reflecting their gender identity or sex assigned at birth, it now allows applicants to obtain a passport reflecting only their sex assigned at birth; and (2) where it once allowed non-binary, intersex, and gender non-conforming applicants to obtain a passport with an "X" sex marker, it has now eliminated that option. In making both substantive changes in conformance with Executive Order 14168, the State Department has drawn classifications based on sex. As to the first policy change, applicants are explicitly treated differently based on their sex assigned at birth. A person who identifies as female can receive a passport marked "F" if her sex assigned at birth was female, but not if her sex assigned at birth was male. Likewise, a person who identifies as male can receive a passport marked "M" if his sex assigned at birth was male, but not if his sex assigned at birth was female. Put more concretely, plaintiffs Zaya Perysian and Chastain Anderson, transgender women, were denied passports marked "F" because their sex assigned at birth was male, but an otherwise identically situated person who likewise identifies as female could receive a passport marked "F" if her sex assigned at birth was female. The differential treatment—in whether the applicant can obtain a passport with a sex marker that reflects their gender identity—is entirely dependent on the applicant's sex assigned at birth. Viewed from any angle, that amounts to a classification based on sex.

This conclusion accords with the logic undergirding the Supreme Court's holding in *Bostock v. Clayton County* that, for purposes of a Title VII claim, discrimination against a person for being transgender is necessarily discrimination on the basis of sex. 590 U.S. 644, 660-61, 669 (2020). The Court explained that if an employer fires a transgender woman who was assigned male at birth, but retains an otherwise identically situated woman assigned female at birth, "the

individual employee's sex plays an unmistakable and impermissible role in the discharge decision," because "transgender status" is "inextricably bound up with sex." *Id.* at 660-61. This same logic led the Tenth Circuit to conclude that when Oklahoma reversed a policy allowing transgender people to obtain birth certificates consistent with their gender identity, its new policy "intentionally discriminate[d] . . . based in part on sex." *Fowler v. Stitt*, 104 F.4th 770, 789 (10th Cir. 2024). Under the policy, a transgender woman could not get a birth certificate reflective of her gender identity, but if her sex assigned at birth had been female rather than male, she could get a birth certificate that matched her gender identity. *Id.* So, too, for a transgender man. *Id.* Under the Equal Protection Clause, as under Title VII, the inescapable conclusion was that the Oklahoma policy classified on the basis of sex. *Id.* at 793-794 (collecting cases applying *Bostock*'s reasoning to equal protection claims).[5]

The second change effected by the Passport Policy—that is, the reversal of the availability of an "X" marker on passports—likewise draws a classification based on sex. When it adopted forms allowing applicants to select "X" for their sex in 2021, the State Department explained that the "third gender marker 'X'" is "for applicants identifying as non-binary, intersex, and/or gender non-conforming." 86 Fed. Reg. at 51436; *see* ECF 53-1, ¶ 8 (the "third option of 'X' as a gender marker [was] for non-binary, intersex, and gender non-conforming persons"). The forms followed litigation that highlighted the complexity of medical evidence on biological sex, especially for intersex people, and the State Department's recognition that "some individuals are born neither male nor female." *Zzyym v. Pompeo*, 958 F.3d 1014, 1024 (10th Cir. 2020). The "X" option thus

---

[5] The government makes no developed argument in this case that *Bostock*'s reasoning does not apply to equal protection claims; indeed, its brief did not mention *Bostock*. But the Tenth Circuit, like other Courts of Appeals, has cogently explained why the logic holds in equal protection and Title VII cases alike. *See, e.g.*, *Fowler*, 104 F.4th at 789-94; *Kadel v. Folwell*, 100 F.4th 122, 153-54 (4th Cir. 2024) (en banc).

supplemented the existing "M" and "F" sex markers, allowing three options for the "sex" field on passports. 86 Fed. Reg. at 51436; *see* ECF 53-1, ¶ 8. Consequently, in 2021, the State Department recognized a conception of sex broader than the binary male and female markers it had previously used on passports. *See id.* But four years later, in Executive Order 14168, it became "the policy of the United States to recognize two sexes, male and female." EO § 2. In conformance with the Executive Order, the State Department reversed its prior policy and announced it would likewise recognize only two sexes, male and female. ECF 32-5; *see* ECF 53-1, ¶¶ 15, 17. That change—the withdrawal of the recognition of a more expansive conception of sex—is a straightforward classification based on sex. Whereas before, the State Department classified sex as broader than the male/female binary, it now classifies sex based only on the male/female binary.

These sex-based classifications are not incidental to the Passport Policy; rather, the sex-based line drawing is the very purpose of the Executive Order and Passport Policy. The Executive Order states plainly that the federal government now must recognize that "women are biologically female," "men are biologically male," and there are only "two sexes, male and female." EO §§ 1-2. And it directs the Secretary of State to require that passports adhere to those sex-based classifications. *Id.* § 3(d). The Secretary of State, in turn, adopted the Passport Policy to comply with the directive set forth in the Executive Order. ECF 53-1, ¶ 15. And the State Department's webpage describing the policy to the public—titled "Sex Marker in Passports"—leaves no doubt that the policy exists to make sex-based classifications. ECF 32-5. In accordance with the Executive Order, and as implemented by the State Department, the Passport Policy was designed and intended to enforce conformity to an individual's sex assigned at birth.

The government resists the conclusion that the Passport Policy classifies on the basis of sex, contending that the policy "'does not prefer one sex over the other.'" ECF 53, at 17 (quoting

*L. W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 480 (6th Cir. 2023), *cert. granted sub nom. United States v. Skrmetti*, 144 S. Ct. 2679 (2024)). But that misstates the inquiry, because "the Equal Protection Clause 'protect[s] *persons*, not *groups*.'" *Parents Involved in Cmty. Sch. v. Seattle Schs. Dist. No. 1*, 551 U.S. 701, 743 (2007) (quoting *Adarand*, 515 U.S. at 227); *see also United States v. Windsor*, 570 U.S. 744, 774 (2013) ("The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any *person* the equal protection of the laws." (emphasis added)). It is not enough for the government to disclaim a sex classification because, in its telling, males as a group and females as a group are treated equally. *See Adarand*, 515 U.S. at 227; *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 142 n.13 (1994). Rather, the focus of the inquiry must be whether, as applied to an individual, there exists a classification based on sex. Put otherwise, "any individual suffers an injury when he or she is disadvantaged by the government because of his or her [sex], whatever that [sex] may be." *Adarand*, 515 U.S. at 230. Here, the plaintiffs have been personally disadvantaged by the government—they can no longer obtain a passport consistent with their gender identity—because of their sex assigned at birth, while similarly situated people can obtain passports consistent with their gender identity if they have a different sex assigned at birth. The Constitution's "principle of consistency simply means that whenever the government treats any person unequally because of his or her [sex], that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." *Id*. at 229-30.

The government also maintains that the Passport Policy "'does not impose any special restraints on, and does not provide any special benefits to, applicants due to their sex.'" ECF 53, at 17 (quoting *Gore v. Lee*, 107 F.4th 548, 555 (6th Cir. 2024)). By now, it should be clear that this argument is mistaken. A person who identifies as female and is assigned female at birth can obtain

a passport reflecting her identity as female, while plaintiffs Zaya Perysian, Bella Boe, and Chastain Anderson cannot obtain a passport reflecting their identity as female, simply because they were assigned male at birth. Likewise, a person who identifies as male and is assigned male at birth can obtain a passport reflecting his identity as male, while plaintiffs Ashton Orr and Reid Solomon-Lane cannot obtain a passport reflecting their identity as male, simply because they were assigned female at birth. And a person who identifies as male or female, and who was assigned one of those sexes at birth, can obtain a passport reflecting their gender identity, while plaintiffs Drew Hall and Sawyer Soe cannot obtain a passport reflecting their non-binary gender identity, simply because they were assigned, respectively, male and female at birth. The Passport Policy does indeed impose a special disadvantage on the plaintiffs due to their sex, and the Court therefore concludes that it discriminates on the basis of sex.[6]

### 2. *Application of Intermediate Scrutiny.*

The conclusion that the Passport Policy discriminates on the basis of sex does not require invalidation of the policy; it simply requires the government to justify its adoption of the policy under intermediate scrutiny. *VMI*, 518 U.S. at 531-33. To defend a policy that classifies on the basis of sex or gender, the government bears the burden to demonstrate that the policy is substantially related to an important government objective. *See id.* at 533; *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 682 F.3d 1, 9 (1st Cir. 2012). The government's justification for

---

[6] The plaintiffs also contend that the Passport Policy warrants heightened scrutiny because transgender status should be recognized as a quasi-suspect class, and the policy discriminates against them on the basis of transgender status. Because the Court has already concluded that the Passport Policy is subject to heightened scrutiny because it classifies on the basis of sex, it need not, at this juncture, consider this distinct and factually intensive contention. *See Bowen v. Gilliard*, 483 U.S. 587, 602-03 (1987) (setting forth factors to consider in determining whether a group constitutes a suspect or quasi-suspect class); *Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (same); *City of Cleburne*, 473 U.S. at 441 (same).

the discriminatory policy "must be genuine, not hypothesized or invented *post hoc* in response to litigation." *VMI*, 518 U.S. at 533. And "[f]ocusing on the differential treatment for denial of opportunity for which relief is sought," the Court must "determine whether the proffered justification is exceedingly persuasive." *Id.* at 532-33 (quotation marks omitted).

The State Department began implementing the Passport Policy two days after the issuance of Executive Order 14168 so as to remain "compliant" and "[c]onsistent with [the] directives set out" in that order. ECF 53-1, ¶¶ 15, 17. To determine the government's justification for the Passport Policy, then, the Court must look to the Executive Order. Section 1 of the Executive Order, titled "Purpose," sets forth three reasons for the government-wide change in policy regarding the definition of sex. First, the government asserts that "ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers." EO § 1. Second, the government wishes to stop what it characterizes as an "attack" on "women"—defined as people "belonging, at conception, to the sex that produces the large reproductive cell"—"by depriving them of their dignity, safety, and well-being." *Id.* §§ 1, 2(b), 2(d). Third, the government believes that the "erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system." *Id.* § 1. Based on these purposes, the Executive Order directs the Secretary of State to update passports to reflect the holder's sex, as that term is defined in Section 2 of the order. *Id.* § 3(d).

The government does not attempt to justify the Passport Policy by reference to any of these express purposes of the Executive Order. Nor could it. It is obvious that the Passport Policy, which denies some applicants passports that reflect their gender identity, has no relation to any claimed

interest in keeping transgender women out of women's domestic abuse shelters, women's workplace showers, and other intimate single-sex places. Similarly, there is no connection between the State Department's prior policy—which allowed applicants to obtain personal-use passports consistent with their gender identity—and any deprivation of cisgender women's "dignity, safety, and well-being." *Id.* §§ 1, 2(b), 2(d). The sex listed on one person's passport has nothing to do with the dignity, safety, or wellbeing of another person. *Cf. Massachusetts*, 682 F.3d at 14-15 (rejecting the argument that denying federal recognition to same-sex marriages has any connection to the wellbeing of opposite-sex marriages). The government further offers no explanation for how a policy that allowed all individuals to obtain passports reflective of their gender identity had a "corrosive impact" on women and "the validity of the entire American system." EO § 1. Any such argument would strain logic, and so it is not surprising that the government does not try to justify the Passport Policy by reference to the stated purposes of the Executive Order.

Instead, the government claims that the Passport Policy advances a different purpose: maintaining a consistent definition of sex across the federal government. Passport data would not be useful for other agencies, the government asserts, if the State Department used a different definition of sex than other agencies. While this goal of consistency is not stated as an express purpose of the Executive Order or the Passport Policy, the government's aim to impose a uniform definition of sex across the federal government is apparent from the face of the Executive Order. That objective does not, however, rank as an important governmental interest that can sustain the constitutionality of the Passport Policy. Settled precedent instructs that a mere claim that a discriminatory policy is justified by an administrative convenience, like a desire for uniformity in data, cannot justify sex- and gender-based classifications. *See, e.g.*, *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 152 (1980) ("the requisite showing has not been made" under heightened

scrutiny "by the mere claim that it would be inconvenient to individualize determinations about widows as well as widowers"); *Craig v. Boren*, 429 U.S. 190, 198 (1976) (Supreme Court decisions "have rejected administrative ease and convenience as sufficiently important objectives to justify gender-based classifications"). The government has introduced no evidence that, to the extent the definition of sex varied across federal agencies before the Executive Order, significant problems emerged. It has not argued that the State Department's prior policy allowing passport applicants to select "M," "F," or "X" consistent with their gender identity inhibited other agencies' functioning. Nor has the government introduced evidence that other agencies in fact rely on the State Department's records of passport applicants' sex, and to the extent they do, how they use that data.[7] On the record before the Court, there is no evidence of a substantial relationship between the Passport Policy and the asserted governmental interest in maintaining a consistent definition of sex across the federal government.

The "Constitution recognizes higher values than speed and efficiency," and the government has failed to proffer an exceedingly persuasive justification for the Passport Policy's sex-based discrimination. *Stanley v. Illinois*, 405 U.S. 645, 656-57 (1972). The plaintiffs are therefore likely to succeed on the merits of their equal protection claim.

---

[7] At the hearing on the plaintiffs' motion, the government pointed to the Tenth Circuit's statement in *Zzyym v. Pompeo* that "law enforcement . . . often uses passport data to identify victims and to locate criminal suspects." 958 F.3d at 1027. The government has not introduced comparable evidence in this case. But even if it had, the State Department updated its policy in 2021 to allow applicants to select an "M," "F," or "X" sex marker consistent with their gender identity *after* the court in *Zzyym* acknowledged the government's interest in making passport data useful for other federal agencies. *See* 86 Fed. Reg. at 51436. Thus, notwithstanding its potential interest in uniformity of data across federal agencies, the State Department concluded that this interest did not justify a binary sex policy that denied intersex, non-binary, and gender non-conforming individuals the option of a third sex marker.

3. *Animus.*

The plaintiffs further contend that, apart from the sex-based discrimination, the Passport Policy, and the Executive Order it implements, violate the guarantee of equal protection because they bear the hallmarks of policies driven by a bare desire to harm transgender Americans.

In a series of cases, the Supreme Court has invalidated on rational basis review government actions that burdened "historically disadvantaged or unpopular" groups, when the governmental justification for its action "seemed thin, unsupported, or impermissible." *Massachusetts*, 682 F.3d at 10. The first, *U.S. Department of Agriculture v. Moreno*, involved a statute that excluded from the food stamp program households containing unrelated individuals, the legislative history of which indicated that Congress wished to prevent "'hippie communes'" from participating in the program. 413 U.S. 528, 530-34 (1973). The Court rejected the government's argument that the statute furthered its interest in minimizing fraud and warned that the "bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Id.* at 534-38. In the second case, *City of Cleburne v. Cleburne Living Center, Inc.*, the Court invalidated a city's requirement that the proposed operator of a group home for people with intellectual disabilities obtain a special use permit, where the city's zoning ordinance did not require the same permit for comparable uses of the land. 473 U.S. at 447-50. Rejecting as illegitimate the city's asserted interests in avoiding negative reactions from property owners located near the group home, protecting group home residents from harassment by neighbors, keeping the home out of a flood plain, limiting the size of the home, and lessening congestion in the streets, the Court concluded that the city's policy rested on an "irrational prejudice" that offended equal protection principles. *Id.* at 449-50. The third case, *Romer v. Evans*, concerned a state constitutional amendment that prohibited state or local government action designed to protect gay and lesbian citizens and

repealed local ordinances that protected against discrimination on the basis of sexual orientation. 517 U.S. 620, 623-24 (1996). Unimpressed with the state's asserted interests in conserving resources and respecting citizens' freedom of association, the Court struck down the amendment because it "impos[ed] a broad and undifferentiated disability on a single named group" and because its "sheer breadth" suggested that it was born of animosity toward "the class it affects." *Id.* at 632-35. Recently, the Court reaffirmed this line of precedent, explaining that when a court cannot "'discern a relationship'" between a challenged policy and a legitimate state interest or when the policy is "'inexplicable by anything but animus,'" the governmental action is incompatible with the right of equal protection. *Trump v. Hawaii*, 585 U.S. 667, 706 (2018).

The plaintiffs are likely to succeed on their claim that the Executive Order, and the Passport Policy implementing that order, spring from the same sort of animus toward transgender Americans. Multiple considerations lead to this conclusion. First, on its face, the Executive Order announces that, for each and every purpose under federal law—regardless of medical nuance, reliance interests, or policy objectives—transgender women are not women and transgender men are not men. The order asserts that "women are biologically female, and men are biologically male," and it defines "women" and "men," respectively, only as persons "belonging, at conception, to the sex that produces the large reproductive cell" and "small reproductive cell." EO §§ 1, 2(b)-(e). It describes the "biological category of 'woman'" as "true" and calls it a "false claim that males can identify as and thus become women and vice versa." *Id.* §§ 1, 2(f). And it appears to deny "that it is possible for a person to be born in the wrong sexed body." *Id.* § 2(f). The order also facially demeans transgender people's identity, stating that one's gender identity "does not provide a

meaningful basis for identification." *Id.* § 2(g).[8] Viewed as a whole, the language of the Executive Order is candid in its rejection of the identity of an entire group—transgender Americans—who have always existed and have long been recognized in, among other fields, law and the medical profession. *See, e.g.*, *Bostock*, 590 U.S. at 653-54 (recognizing transgender Americans); *Kosilek v. Spencer*, 774 F.3d 63, 68-69 (1st Cir. 2014) (same); ECF 30-1, ¶¶ 42-43, 51, 53-54.

Second, Executive Order 14168 imposes a "broad and undifferentiated disability" on a discrete group of people. *Romer*, 517 U.S. at 632. The order makes it the official "policy of the United States" to recognize only "two sexes" based on people's "immutable biological classification as either male or female." EO §§ 2, 2(a). Transgender Americans—individuals who, by definition, have a gender identity different from their sex assigned at birth—are uniquely affected by this policy, even though the Executive Order does not in so many words identify them as the targeted group. *See* ECF 30-1, ¶ 48.[9] Sweeping in scope, the Executive Order directs federal agencies to eradicate any use of the term "gender" in federal policies and documents, EO § 3(c); orders agencies to "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology," *id.* § 3(e); and forbids the use of federal funds "to promote gender ideology," *id.* § 3(g). It requires that "government-issued identification documents, including passports, visas, and Global Entry cards," as well as all transgender federal employees' personnel records, reflect only a person's sex, as

---

[8] It is undisputed that gender identity is fundamental to defining the category of transgender people, who are, definitionally, people whose gender identity diverges from their sex assigned at birth. ECF 30-1, ¶ 48.

[9] Erasing any doubt, OMB cited Executive Order 14168 soon after its issuance to proclaim that the "use of Federal resources to advance . . . transgenderism . . . is a waste of taxpayer dollars." Memorandum from Acting Director of the Office of Management and Budget Matthew J. Vaeth to the Heads of Executive Departments and Agencies, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs*, M-25-13 (Jan. 27, 2025), https://perma.cc/DP3B-9CK3.

defined in the order. *Id.* § 3(d). It orders that detained transgender women be moved from women's prisons or detention centers to men's prisons or detention centers, *id.* § 4(a), and strips all federal transgender prisoners of their access to gender-affirming medical care, *id.* § 4(c). It further directs rescission of prior Executive Orders addressing, among other topics, "Transgender Equality," "Supporting Transgender Youth in School," "Supporting Intersex Students," and "Confronting Anti-LGBTQI+ Harassment in Schools." *Id.* § 7(c). As in *Romer*, the "sheer breadth" of the Executive Order's impact—in this case, on transgender Americans—suggests it is "inexplicable by anything but animus toward the class it affects." 517 U.S. at 632; *see Hawaii*, 585 U.S. at 706.

Third, the government does not defend the Passport Policy by reference to the Executive Order's express purposes. Rather, the government relies on, as discussed, the argument that the Passport Policy and Executive Order advance a governmental interest in data consistency across federal agencies. In the 2020 case *Zzyym v. Pompeo*, the government invoked that same interest, among others, in defense of the State Department's prior policy that allowed applicants to obtain a passport consistent with a male or female gender identity, but did not allow for a third sex marker for intersex, non-binary, or gender non-conforming applicants. 958 F.3d at 1027. Although the Tenth Circuit found some of the governmental rationales for the binary sex policy unsupported, it did conclude that because law enforcement agencies may access passport data and a non-binary sex policy could introduce disuniformity across agencies, the State Department's reliance on that rationale was supported by the administrative record. *Id.* The court then remanded because it could not determine whether the State Department had relied on permissible or impermissible rationales for the policy. *Id.* at 1033-35. On remand, the State Department chose to change its policy to allow applicants to select an "M," "F," or "X" sex marker consistent with their gender identity. *See* 86 Fed. Reg. at 51436. Thus, notwithstanding the Tenth Circuit's recognition of a potential interest in

uniformity of data across federal agencies, the State Department concluded in 2021 that this interest was *not* weighty enough to justify a binary sex policy that denied intersex, non-binary, and gender non-conforming people the option of a third sex marker. The government has introduced no evidence or argument that any resultant inconsistency in data across federal agencies has given rise to problems, for law enforcement agencies or otherwise, in the years the policy was in effect. In view of that history and the evidentiary void, the Court cannot "discern a relationship" between the Passport Policy and any genuine interest in maintaining a uniform definition of sex across data kept by the State Department and other federal agencies. *Hawaii*, 585 U.S. at 706.

Fourth, Executive Order 14168 and the Passport Policy were part of a constellation of close-in-time executive actions directed at transgender Americans that contained powerfully demeaning language. *Cf. Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533-35 (1993) ("reject[ing] the contention" that a court's inquiry into whether a government acts with "hostility" toward religious belief "must end with the text of the laws at issue," and looking as well to a resolution adopted by the city council around the same time as the challenged ordinances); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) (to determine whether a facially neutral government action is based on discriminatory intent, a court may look to the "historical background of the decision," "particularly if it reveals a series of official actions taken for invidious purposes"). Executive Order 14183, issued on January 27, 2025, prohibited transgender people from serving in the armed forces without an exemption. 90 Fed. Reg. 8757 (Jan. 27, 2025). It declared that "adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle," and that "[a] man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member." *Id.* § 1. Executive

Order 14187, titled "Protecting Children From Chemical and Surgical Mutilation," issued on January 28, 2025, effectively banned all gender-affirming medical care for transgender youth by federally funded institutions. *See* 90 Fed. Reg. 8771 (Jan. 28, 2025). It directed federal agencies to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children," with the term "chemical and surgical mutilation" defined to include many treatments for gender dysphoria. *Id.* §§ 2(a), 2(c), 4; *see* ECF 30-1, ¶ 59. And finally, Executive Order 14201, titled "Keeping Men Out of Women's Sports," issued on February 5, 2025, faulted "sport-specific governing bodies" that either lack an "official position or requirements regarding trans-identifying athletes" or "allow men to compete in women's categories." 90 Fed. Reg. 9279 (Feb. 5, 2025). The order, which relies on the definitions of sex and other terms in Executive Order 14168, misgenders transgender women in its title and throughout the body of the order. *Id.* §§ 1, 4. Although aimed at different policy goals, each of these related orders, in tone and language, conveys a fundamental moral disapproval of transgender Americans. *See Windsor*, 570 U.S. at 770 (the Defense of Marriage Act violated equal protection principles in part because of the "strong evidence of [the] law having the purpose and effect of disapproval of th[e] class" of married gay and lesbian couples).

Americans are engaged in robust conversations about sex, gender, and identity that are characteristic of a free and open society. The Court expresses no view on whether the government interests underlying Executive Orders 14183, 14187, and 14201 may justify the burden they impose on transgender Americans. But neither can it ignore the moral disapproval conveyed in those orders or the depth and breadth of recent federal action affecting transgender people. Executive Order 14168 and the Passport Policy are part of a coordinated and rapid rollback of rights and protections previously afforded to transgender Americans, suggesting that these

31

challenged actions are built on a foundation of irrational prejudice toward fellow citizens whose gender identity does not match their sex assigned at birth. For all of these reasons, and under any standard of review, such targeting of a politically unpopular group runs afoul of our Nation's constitutional commitment to equal protection.

      B.    <u>Right to Travel and Invasion of Privacy Claims.</u>

      The plaintiffs next claim that the Passport Policy and Executive Order infringe their rights to international travel and informational privacy under the Due Process Clause of the Fifth Amendment. *See Kent*, 357 U.S. at 125 ("The right to travel," including the right to travel abroad, "is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment."); *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977) (noting two kinds of privacy interests that may be constitutionally protected: "the individual interest in avoiding disclosure of personal matters" and "the interest in independence in making certain kinds of important decisions"). The law is unsettled regarding the standard of review applicable to government actions alleged to infringe the right to international travel. *Compare Maehr v. U.S. Dep't of State*, 5 F.4th 1100, 1119-22 (10th Cir. 2021) (holding that there is no fundamental right to international travel and evaluating the statute authorizing revocation of plaintiff's passport under rational basis review), *with Eunique v. Powell*, 302 F.3d 971, 976 (9th Cir. 2002) (McKeown, J., concurring) (arguing that burdens on international travel should be evaluated under intermediate scrutiny), *and Woodward v. Rogers*, 344 F. Supp. 974, 988 (D.D.C. 1972) (the denial of a passport to an applicant who refused to swear an "Oath of Allegiance" violated the right to international travel because the requirement was "not reasonably justified" and "[could] be served by far less restrictive means"), *aff'd*, 486 F.2d 1317 (D.C. Cir. 1973). The law is also unsettled regarding the scope of the privacy rights described in *Whalen*. *See Nat'l Aeronautics & Space Admin. v. Nelson*,

562 U.S. 134, 138 (2011) (assuming without deciding the existence of a "constitutional privacy 'interest in avoiding disclosure of personal matters'" (quoting *Whalen*, 429 U.S. at 599-600)); *id.* at 162 (Scalia, J., dissenting) ("[T]here is no constitutional right to 'informational privacy.'"); *see also Gore*, 107 F.4th at 561-65 (surveying cases and explaining that any constitutionally protected right to informational privacy must be narrowly construed); *id.* at 578-84 (White, J., dissenting) (surveying cases and concluding that transgender status falls within ambit of constitutionally protected informational privacy interests).

Under the doctrine of constitutional avoidance, federal courts must avoid deciding "constitutional issues where alternative grounds for resolution are available." *Am. Civil Liberties Union of Mass. v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44, 52 (1st Cir. 2013); *see Mills v. Rogers*, 457 U.S. 291, 305 (1982) ("It is this Court's settled policy to avoid unnecessary decisions of constitutional issues."). The Court has already explained that the plaintiffs are likely to prevail on the merits of their Fifth Amendment equal protection claim. Having so concluded, the Court will decline, at this juncture, to address the plaintiffs' separate informational privacy and right to travel claims under the Fifth Amendment, as resolution of the constitutional disputes attending those claims would have no further effect on the plaintiffs' entitlement to the relief requested in their motion.

C.    <u>Administrative Procedure Act Claims.</u>

The plaintiffs separately claim that the Passport Policy violates the Administrative Procedure Act because it is arbitrary and capricious and was adopted "without observance of procedure required by" the Paperwork Reduction Act, 44 U.S.C. §§ 3501 *et seq. See* 5 U.S.C. §§ 706(2)(A), (D). The State Department and Secretary Rubio, as the Agency Defendants, respond that these claims are not subject to judicial review or, in the alternative, that the plaintiffs have not

demonstrated a likelihood of success on either APA claim. The plaintiffs have the better of each of these arguments.

### 1. *Reviewability of the Passport Policy.*

The Agency Defendants contend that the plaintiffs' APA claims are not amenable to judicial review for three distinct reasons: (1) the Passport Policy is a presidential action, not an agency action, and therefore is not subject to review under the APA; (2) the Passport Policy is the type of action "traditionally regarded as committed to agency discretion," *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993); and (3) the Passport Policy implicates a foreign affairs decision made by the federal government.

The APA permits judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Presidential actions, like executive orders, are not, however, subject to APA review because "the President is not an agency within the meaning of the [APA]." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). The Agency Defendants argue that because the Passport Policy implements Executive Order 14168, it is similarly not reviewable under the APA.

This argument finds no foothold in the text of the APA or on-point case law. Under the APA, the term "agency" is defined as "each authority of the Government of the United States," which includes the State Department. 5 U.S.C. § 701(b)(1). The APA contains no exception for agency actions, like the State Department's Passport Policy, that carry out an executive order. *See id.* § 704. As the Ninth Circuit recently explained, "final agency actions, even if implementing an executive order, are subject to judicial review under the APA." *State v. Su*, 121 F.4th 1, 15 (9th Cir. 2024); *see id.* (neither the Supreme Court nor any Court of Appeals has ever "excepted a final rule from APA review because it carried out a presidential directive"); *accord Chamber of Com. of U.S.*

*v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) ("[T]hat the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA[.]"). Indeed, the First Circuit recently rejected a similar argument that an OMB directive was unreviewable under the APA simply because it implemented executive orders. *New York v. Trump*, 133 F.4th 51, 70 n.17 (1st Cir. 2025) ("[T]he District Court did not review the *President's* actions for consistency with the APA. Rather, it reviewed—and ultimately enjoined—the *Agency Defendants'* actions under the Executive Orders.").

The Agency Defendants nonetheless maintain that the Passport Policy is unreviewable because the Passport Act gives the President "broad discretionary authority" to issue rules for passports. ECF 53, at 7. Under the Passport Act, "[t]he Secretary of State may grant and issue passports . . . under such rules as the President shall designate and prescribe for and on behalf of the United States." 22 U.S.C. § 211a. This permissive language recognizes the Executive's "substantial discretion" to issue passports. *Agee*, 453 U.S. at 294 & n.26. But the key Supreme Court decision barring judicial review of discretionary presidential action, *Franklin v. Massachusetts*, "is limited to those cases in which the President has final constitutional or statutory responsibility for the final step necessary for the agency action directly to affect the parties." *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993). The final step of executive action that directly affected the plaintiffs here was the Passport Policy, not Executive Order 14168. The Executive Order directed the State Department to "implement changes to require that government-issued identification documents, including passports, . . . accurately reflect the holder's sex." EO § 3(d). The State Department, in turn, "evaluat[ed] how to implement this policy" and, deferring in part to HHS's guidance, "interpreted its obligations under E.O. 14168" as being met by defining "[s]ex at birth, which can generally be adjudicated using a birth

35

certificate," instead of "'sex at conception,'" which it lacks "the capacity to adjudicate." ECF 53-1, ¶¶ 14-15, 18. The State Department thus made at least three independent determinations in formulating the Passport Policy: (1) it departed from the Executive Order's definition of "female," "male," and "sex," which depend on the size of the reproductive cells produced by a person at "conception," EO §§ 2(a), (d)-(e); (2) it chose to defer to HHS's guidance on the meaning of these terms, which likewise does not turn on "sex at conception"; and (3) it determined what sources of evidence to consult in order to assess a person's sex at birth.

These facts distinguish this case from *Detroit International Bridge Company v. Government of Canada*, upon which the Agency Defendants principally rely. *See* 189 F. Supp. 3d 85 (D.D.C. 2016), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017) (subsequent history omitted). In *Detroit International*, the court held that the State Department's issuance of a permit for an international bridge was presidential action not subject to APA review. *Id.* at 98-105. Even though the President had issued an executive order allowing the State Department to issue such permits, the court reasoned, the Department's role was purely ministerial because it "exercised discretionary authority committed to the President by" the International Bridge Act of 1972, which required the President alone to approve these bridges. *Id.* at 96-97, 100-02; *see* 33 U.S.C. § 535(b) ("No bridge may be constructed, maintained, and operated . . . unless the President has given his approval thereto."). Here, by contrast, the State Department's implementation of the President's Executive Order does not constitute a "ministerial act" in which "nothing is left to the exercise of the official's discretion or judgment." *In re Soares*, 107 F.3d 969, 974 (1st Cir. 1997); *see* Ministerial, *Black's Law Dictionary* (12th ed. 2024) (defining "ministerial" as "involving an act that involves obedience to instructions or laws instead of discretion, judgment, or skill"). The government's declaration confirms, as explained, that the State Department exercised judgment in interpreting

36

and complying with the Executive Order. ECF 53-1, ¶¶ 14-15, 18; *see Milligan v. Pompeo*, 502 F. Supp. 3d 302, 314 (D.D.C. 2020) (distinguishing *Detroit International* where the State Department needed "to exercise its judgment" implementing a presidential proclamation).

The Agency Defendants next contend that even if the policy constitutes agency action, it is not reviewable because the APA excludes judicial review of "agency action . . . committed to agency discretion by law." 5 U.S.C. § 701(a)(2). "The APA establishes a 'basic presumption of judicial review [for] one suffering legal wrong because of agency action.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16-17 (2020) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967)). To honor this presumption, the agency-discretion exception has been read "'quite narrowly,'" *id.* at 17 (quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018)), and confined "to those rare 'administrative decision[s] traditionally left to agency discretion,'" *id.* (quoting *Lincoln*, 508 U.S. at 191).

The Passport Act, as discussed, affords the Executive "substantial discretion" to issue passports. *Agee*, 453 U.S. at 294 & n.26 (citing 22 U.S.C. § 211a). But "while the power of the Secretary of State over the issuance of passports is expressed in broad terms," Congress did not "give him unbridled discretion to grant or withhold a passport from a citizen for any substantive reason he may choose." *Kent*, 357 U.S. at 127-28. To the contrary, the State Department's passport decisions are subject to judicial review and can be struck down if they fail "to pass scrutiny by the accepted tests." *Id.* at 129. In *Kent v. Dulles*, for example, the Supreme Court overturned the State Department's refusal to issue passports based on political beliefs or associations. *Id.* at 130. In subsequent cases, the Supreme Court reviewed whether actions taken by the State Department with respect to passports complied with the Passport Act, looking to whether the agency's action was "sufficiently substantial and consistent to compel the conclusion that Congress has approved it."

*Agee*, 453 U.S. at 306 (quotation marks omitted) (Secretary's revocation of passport complied with Passport Act); *see also Zemel*, 381 U.S. at 10-13 (Secretary's refusal to validate passports for travel to Cuba was consistent with Passport Act). And in a case relied upon extensively by the Agency Defendants here, *Zzyym v. Pompeo*, the Tenth Circuit reviewed an APA challenge to the State Department's prior binary sex policy for passports to assess whether the policy was arbitrary and capricious. 958 F.3d at 1022-32; *see also Shachtman v. Dulles*, 225 F.2d 938, 940-41 (D.C. Cir. 1955) (finding that "the discretion residing in the Secretary [under 22 U.S.C. § 211a] is subject in its exercise to some judicial scrutiny," including whether the reason for refusing a passport "was arbitrary"). These precedents compel the conclusion that the Passport Act furnishes a "meaningful standard against which to judge the agency's exercise of discretion," *Heckler v. Chaney*, 470 U.S. 821, 830 (1985), and that the State Department's determinations with respect to passports are "not one of those areas traditionally committed to agency discretion," *Dep't of Commerce v. New York*, 588 U.S. 752, 772 (2019).

Finally, the Agency Defendants contend that the Passport Policy should not be subject to judicial review because passports implicate foreign affairs. "Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention." *Agee*, 453 U.S. at 292. Nevertheless, in the course of exercising its power of judicial review, the Supreme Court has distinguished cases involving "passport refusals based on the character of the particular applicant" from those implicating "foreign policy considerations affecting all citizens." *Zemel*, 381 U.S. at 13. In *Kent*, the Court "held that Congress had not authorized the Secretary of State to inquire of passport applicants as to affiliation with the Communist Party." *Regan v. Wald*, 468 U.S. 222, 240 (1984). By contrast, in *Zemel*, the Court upheld "a refusal by the Secretary of State to validate the passports of United States citizens for travel to Cuba." *Id.* at 241.

The Agency Defendants fail to explain how the Passport Policy pertains to foreign relations rather than a characteristic of passport applicants. The Passport Policy was adopted to implement Executive Order 14168, which set a policy on sex across the federal government, including for all domestic purposes. Nothing in the Executive Order mentions foreign relations, and the government's declaration in this case does not justify the Passport Policy on foreign affairs or national security grounds; instead, it avers that the policy was promulgated to comply with Executive Order 14168. *See* ECF 53-1, ¶¶ 15, 17. Accordingly, the Court concludes that the Passport Policy is based on "characteristic[s] peculiar" to applicants like the plaintiffs—namely, their sex and gender. *Zemel*, 381 U.S. at 13. It is not, therefore, a matter so intertwined with foreign relations that it is insulated from judicial review. *See Zzyym*, 958 F.3d at 1022-34 (reviewing State Department rules regarding passports); *Salem v. Pompeo*, No. 19-cv-363-LDH-CLP, 2024 WL 1364320, at *4 (E.D.N.Y. Mar. 31, 2024) (same).

### 2. Whether the Passport Policy Is Arbitrary and Capricious.

The Agency Defendants do not dispute that, to the extent the Passport Policy is reviewable, it is a "final agency action" subject to APA review. *See* 5 U.S.C. § 704. For an agency action to be "final," the action "must mark the consummation of the agency's decisionmaking process" and "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotation marks omitted); *see Trafalgar Cap. Assocs., Inc. v. Cuomo*, 159 F.3d 21, 35 (1st Cir. 1998) (final agency action "must be a definitive statement of the agency's position with direct and immediate consequences" (brackets and quotation marks omitted)). Both conditions are met here. The State Department finalized the Passport Policy in late January 2025, when, among other things, it instructed all domestic and foreign passport agencies that the Policy would take immediate effect, updated its

website with information concerning the Policy, and replaced the passport forms on its website with earlier versions of those forms, which conformed to the Policy but are expired. *See* ECF 53-1, ¶¶ 15-17. Expedited passport applications have been processed in accordance with the Passport Policy since as early as January 24, 2025, and all passport applications have been processed in accordance with the Policy since February 7, 2025. *See* ECF 53-1, ¶ 18. The Passport Policy is thus the "consummation" of the Agency Defendants' decisionmaking process from which "legal consequences" have already begun to flow. *See Bennett*, 520 U.S. at 178 (quotation marks omitted).

The APA authorizes courts to "hold unlawful and set aside" final agency actions found to be arbitrary and capricious. 5 U.S.C. § 706(2)(A). "'The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained.'" *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 98 (1st Cir. 2025) (quoting *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). "An agency action is arbitrary and capricious when the agency 'relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise.'" *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (quoting *Assoc'd Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997)). The APA provides for a narrow and deferential scope of review, and "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

The plaintiffs contend that the Passport Policy is arbitrary and capricious because, among other things, the Agency Defendants have failed to offer a reasoned explanation for their decision to reverse the State Department's prior passport policy.[10] While an agency "'may change its existing position on an issue,'" it must provide "a reasoned explanation for the change" that addresses any factual findings undergirding the changed policy that contradict those supporting the prior policy. *Housatonic River Initiative v. U.S. Env't Prot. Agency, New Eng. Region*, 75 F.4th 248, 270 (1st Cir. 2023) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016), and citing *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)); *accord Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 917 (2025). The agency must also "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents of the Univ. of California*, 591 U.S. at 33. The record contains no evidence that the Agency Defendants fulfilled these obligations here. The Passport Policy—posted on the Department of State's website—does not make factual findings, does not explain why the facts supporting the Department's prior passport policy no longer carry weight, and does not address reliance interests affected by its

---

[10] The government argues that, for purposes of assessing the plaintiffs' likelihood of success on their APA claims, the Court should not consider any of the declarations submitted by the plaintiffs and should "instead focus on the materials that were before the Department when it developed the Policy." ECF 53, at 6. Ordinarily, judicial review of agency action is limited to "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). The Court cannot, however, ascertain the materials that were before the State Department when it developed the Passport Policy because the government has not yet filed the administrative record. And when asked at the motion hearing whether the State Department had considered any materials other than the Executive Order, counsel for the government demurred. *See* ECF 65, at 57:12-59:7. It would, therefore, be appropriate to consider the declarations as "supplemental evidence" to the extent that they would facilitate the Court's comprehension of the Passport Policy. *City of Taunton v. EPA*, 895 F.3d 120, 127 (1st Cir. 2018). But this issue is, ultimately, beside the point, because the Court's analysis of the plaintiffs' APA claim is limited to the materials submitted by the government.

reversal of the prior policy. *See* U.S. Dep't of State, *Sex Marker in Passports*, (last visited Apr. 18, 2025), perma.cc/B38H-QS22. Instead, it merely suggests that the policy was adopted in accordance with Executive Order 14168. *See id.* Further, there is no evidence before the Court that, in adopting the Passport Policy, the Agency Defendants took steps to identify facts bearing on its policy change, attempted to identify potential reliance interests, or sought to determine how any such interests may be impacted by the policy changes.[11]

Quite the contrary: the record indicates that the State Department considered virtually nothing aside from the Executive Order's directive when it developed the Passport Policy. *See* 90 Fed. Reg. 9652 (Feb. 14, 2025) (stating only that the passport forms had been revised "[t]o comply with E.O. 14168"); 90 Fed. Reg. 9800 (Feb. 18, 2025) (same); ECF 53-1, ¶¶ 15-21 (similar). The Agency Defendants do not dispute this characterization of their decisionmaking process, and indeed affirm that the Passport Policy was adopted and announced mere days after the President signed Executive Order 14168. *See* ECF 53, at 10-12; ECF 53-1, ¶¶ 10, 15-17. Instead, they argue that because the State Department issues passports "under such rules as the President shall designate and prescribe," 22 U.S.C. § 211a, the Executive Order's directive is reason enough, for

---

[11] A comparison between the State Department's prior actions in relation to identity fields on passports and its current Passport Policy process underscores the lack of reasoned decisionmaking here. The State Department does not require that passports bear an applicant's name assigned at birth; rather, it allows passport applicants to apply for, and receive, passports with a changed name that reflects their current identity. In adopting its current policy on name changes on passports, now codified at 22 C.F.R. § 51.25, the State Department issued a notice of proposed rulemaking that set a 60-day comment period for interested members of the public to weigh in on the proposed changes to the regulation. *See* 72 Fed. Reg. 10095 (Mar. 7, 2007). The notice explained that the revisions to the regulation were "intended to clarify what is required of an applicant whose name has changed and to reflect more accurately Department practice in this regard." *Id.* at 10096. After the comment period ended, the Department issued a notice of final rule in the Federal Register that, among other things, addressed comments submitted by the public. *See* 72 Fed. Reg. 64930, 64930-31 (Nov. 19, 2007). Through this process, the Department solicited feedback, which allowed it to consider any pertinent facts and whether any reliance interests in the prior rule were implicated by its changes.

purposes of arbitrary-and-capricious review, to justify their adoption of the Passport Policy. That argument fundamentally misstates the law. Even in a domain, such as this, where Congress has "confer[red] broad authority" on an agency, the agency remains subject to the requirements of the APA and its actions remain subject to review for arbitrariness. *Dep't of Commerce*, 588 U.S. at 771-77 (reviewing agency action under the arbitrary and capricious standard even though the relevant statute left "much to the Secretary's discretion"); *see also Su*, 121 F.4th at 16 ("[T]here is . . . nothing untenable about analyzing the impacts, costs, and benefits of alternative policy options when issuing a rule that implements an executive order."). The Agency Defendants' position would contravene settled precedent and would improperly insulate wide swaths of agency action from judicial review, so long as the government could point to a related executive order and a conferral of broad authority on an agency.

The State Department has included sex on passports for roughly fifty years. *See* ECF 53-1, ¶ 5. For over half that time—from 1992 to January 2025—it has permitted applicants, with various requirements for medical documentation, to select a sex marker that differs from their sex assigned at birth. *See id.* ¶¶ 5-10. In announcing that it would reverse course and issue passports with sex markers that only correspond to an applicant's sex assigned at birth, the State Department jettisoned its practice of more than thirty years with no explanation of the facts on which it premised its new determination and no consideration of the reliance interests in its prior policy. On this record, the Court cannot conclude that the State Department "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quotation marks omitted). The plaintiffs are, accordingly, likely to succeed on the merits of their claim that the Passport Policy is arbitrary and capricious, in violation of the APA.

### 3. *Whether the Passport Policy Complies with the Paperwork Reduction Act.*

The plaintiffs next claim that the Passport Policy was adopted "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), because the Agency Defendants failed to comply with the procedures set forth in the Paperwork Reduction Act ("PRA") when they replaced the passport forms on the State Department's website. The Agency Defendants replaced the forms in effect on January 19, 2025 with earlier forms that had been promulgated in accordance with a prior passport policy that did not allow the option of an "X" sex marker. *Compare* ECF 33-2 to 33-4 (passport forms promulgated under the prior passport policy indicating that applicants can self-identify their gender and choose an "M," "F," or "X" marker), *with* ECF 33-5 to 33-7 (passport forms used immediately before the prior passport policy, which require applicants to identify their sex by choosing either an "M" or "F" marker).

The PRA provides, in pertinent part, that federal agencies must "provide 60-day notice in the Federal Register, and otherwise consult with members of the public and affected agencies concerning each proposed collection of information, to solicit comment to," among other things, "evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency." 44 U.S.C. § 3506(c)(2)(A). Instruments for collecting such information under the PRA "include tax forms, Medicare forms, financial loan applications, job applications, questionnaires, compliance reports, and tax or business records." *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 33 (1990); *see* 44 U.S.C. § 3502(3) (defining "collection of information"). The parties agree that the passport forms are covered by the PRA, and the Agency Defendants concede that the State Department uploaded prior versions of the forms without first issuing a 60-day notice. *See* ECF 53, at 4-5; ECF 53-1, ¶¶ 17, 20 (noting that the State Department uploaded prior versions of the forms in late-January and published 30-day comment notices in

mid-February); ECF 30, at 16-17. Given these undisputed facts, the plaintiffs have established a substantial likelihood of succeeding on their claim that the Agency Defendants uploaded the prior versions of the passport forms "without observance of procedure required by [the PRA]," in violation of the APA. 5 U.S.C. § 706(2)(D).

The Agency Defendants' counterarguments are unpersuasive. They first contend that APA review is impliedly foreclosed because although the PRA authorizes an individual to challenge the validity of information collection forms when defending against an enforcement action, it does not create a private cause of action. *See* ECF 53, at 16 (citing 44 U.S.C. § 3512(b) and 5 U.S.C. § 702). But whether the PRA establishes a private right of action is not pertinent here, because the plaintiffs do not assert a direct claim under the PRA. Rather, they assert an APA claim alleging that the State Department's issuance of new forms without the requisite 60-day notice under the PRA was taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D); *see* ECF 1, ¶ 250. The APA "permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014), and courts have routinely concluded that such suits include APA claims alleging violations of the PRA, *see, e.g.*, *Hyatt v. OMB*, 908 F.3d 1165, 1172-75 (9th Cir. 2018) (finding jurisdiction to hear plaintiff's PRA petition under the APA); *Drs. for Am. v. Off. of Pers. Mgmt.*, No. 25-cv-322-JDB, 2025 WL 452707, at *7 (D.D.C. Feb. 11, 2025) (plaintiff "established a substantial likelihood of success as to its PRA-notice claim" alleging that the government "violated the APA by acting contrary to . . . the PRA").

The Agency Defendants next contend that the plaintiffs "cannot argue that the State Department failed to go through proper procedures" because the prior passport forms were promulgated in accordance with the PRA's notice and comment requirements. ECF 53, at 16. In

addition to its notice and comment requirements, however, the PRA provides that an "agency shall not conduct or sponsor the collection of information unless," among other things, the Director of the OMB "has approved the proposed collection of information." 44 U.S.C. § 3507(a)(2). And the "Director may not approve a collection of information for a period in excess of 3 years." *Id.* § 3507(g). The Agency Defendants concede that the Director's approval of the prior passport forms, which were promulgated in 2021, has expired. *See* ECF 53, at 4, 16; ECF 33-5 to 33-7 (copies of the passport forms currently posted to the State Department's website, each of which lists an expiration date between November 2022 and December 2023). Thus, although the prior passport forms were promulgated in accordance with the PRA's notice and comment requirements, the Agency Defendants were nevertheless required to obtain the Director's approval before they began using those forms again in January 2025. *See* 44 U.S.C. § 3507(a)(2). Because the Agency Defendants failed to do so, the plaintiffs have established a substantial likelihood of success on their claim that the Agency Defendants violated the APA by failing to comply with the PRA.

## II.    **Irreparable Harm.**

The plaintiffs assert that, absent injunctive relief while this case is adjudicated, they will experience irreparable harm. Irreparable harm is "an injury that cannot adequately be compensated for by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005); *see Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996) (noting that to establish a likelihood of irreparable harm, "[i]t is usually enough if the plaintiff shows that its legal remedies are inadequate"). The plaintiffs must "demonstrate that irreparable injury is *likely*," rather than merely *possible*, "in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). That said, "the injury need not have been inflicted . . . or be

certain to occur;" "a strong threat of irreparable injury before trial is an adequate basis." Charles A. Wright, Arthur R. Miller, Mary K. Kane & Alexandra D. Lahav, 11A Fed. Prac. & Proc. § 2948.1 (3d ed. Apr. 2025 update). Irreparable harm is measured on "a sliding scale, working in conjunction with a moving party's likelihood of success on the merits." *Vaquería Tres Monjitas*, 587 F.3d at 485.

Every plaintiff except for Soe has been diagnosed with gender dysphoria, a medical condition that describes "the significant emotional distress" and impairment in functioning "that stems from the incongruence between a person's gender identity and sex designated at birth." ECF 30-1, ¶ 53; *see* ECF 30-3, ¶ 5; ECF 30-4, ¶ 6; ECF 30-5, ¶ 6; ECF 30-6, ¶ 6; ECF 30-7, ¶ 6; ECF 30-8, ¶ 6. Gender dysphoria can be effectively managed with appropriate treatment, ECF 30-1, ¶ 56, and the recognized standard of care is "designed to bring a person's body and expression of their sex in line with their gender identity," *id.* ¶ 58. Part of this treatment "includes living one's life consistently with one's gender identity, including using identity documents." *Id.* ¶ 77. Indeed, the plaintiffs report that obtaining gender-concordant identity documents has decreased their feelings of anxiety and distress and improved their feelings of safety and comfort—largely because they need not fear being outed when presenting identity documents that reflect their gender identity and expression. *See* ECF 30-3, ¶¶ 6, 8-9; ECF 30-4, ¶¶ 7-8; ECF 30-5, ¶¶ 7-8; ECF 30-6, ¶¶ 7-8; ECF 30-7, ¶¶ 8, 10-11; ECF 30-8, ¶¶ 7, 10-11; ECF 30-9, ¶ 8.

The plaintiffs' inability to obtain passports bearing sex markers consistent with their gender identity and expression is thus likely to impede efforts to treat and manage their gender dysphoria. *See* ECF 30-1, ¶ 77. Each plaintiff avers that they would experience anxiety or distress, or fear for their safety, if required to use a passport with a sex marker that corresponds to their sex assigned at birth rather than their gender identity. *See* ECF 30-3, ¶¶ 8, 12, 14; ECF 30-4, ¶¶ 7, 14-15; ECF

47

30-5, ¶¶ 8-11; ECF 30-6, ¶¶ 8, 12-15; ECF 30-7, ¶¶ 14-15; ECF 30-8, ¶ 11; ECF 30-9, ¶¶ 8, 11. Empirical research substantiates these concerns. According to meta-analyses commissioned by the World Health Organization and conducted by the plaintiffs' expert epidemiologist, Dr. Scheim, possessing gender-concordant identity documents is "associated with a 47% reduction in the odds of serious psychological distress." ECF 30-2, ¶ 30. Dr. Scheim further reports that transgender individuals "who had changed the gender marker on their passport were 18% less likely to meet criteria for serious psychological distress, 16% less likely to have seriously considered suicide in the past year, and 34% less likely to have attempted suicide in the past year, as compared to those who had the correct gender [marker] on some of their documents but had not corrected their passport." *Id.* ¶ 37.

Transgender individuals are also more likely to experience violence or harassment if required to use passports bearing a sex marker corresponding to their sex assigned at birth. *See id.* ¶ 22 ("In the 2015 United States Transgender Survey . . . 32% of respondents who had presented an identity document that did not match their gender presentation had at least one negative experience, including verbal harassment (25%), denial of service (16%), being asked to leave a venue (9%), and assault (2%)."); *see generally* ECF 31-2 (2015 United States Transgender Survey). Among transgender people who passed through airport security in a single year, those who used a passport bearing a sex marker corresponding to their sex assigned at birth were over 10% more likely to be questioned about their name or gender than those who used a passport with an updated sex marker. *See* ECF 30-2, ¶ 23 (reporting that 6% of those with an updated marker were questioned, as compared to 17.6% of those without an updated marker). Three of the plaintiffs have already experienced harassment when presenting identity documents bearing sex markers corresponding to their sex assigned at birth. In 2017, Anderson was detained by TSA agents and

strip searched when she presented a driver's license displaying her sex assigned at birth. *See* ECF 30-6, ¶ 13. In January of this year, Orr was accused by TSA agents of presenting a "fake identification document" because his passport bore a female sex marker whereas his driver's license bore a male sex marker. ECF 30-4, ¶ 10; *see also id.* ¶ 9 (Orr noting that, in 2023, an Icelandic car rental agency initially refused to rent him a car because the sex markers on his driver's license and passport did not match). And Perysian avers that prior to updating her driver's license, she experienced "significant harassment" when airport employees noticed the disjunction between her gender expression and the sex marker on her driver's license, including pat downs by TSA agents seeking to confirm her gender. *See* ECF 30-3, ¶ 8.

These are not speculative harms. Each of the plaintiffs plans to travel internationally in 2025—Perysian, Anderson, and Soe for work, *see* ECF 30-3, ¶¶ 10, 13; ECF 30-6, ¶ 9; ECF 30-9, ¶ 10; Orr for medical care, *see* ECF 30-4, ¶ 13; Hall for their Ph.D. program, *see* ECF 30-7, ¶ 9; Boe for an extracurricular, *see* ECF 30-5, ¶ 9; and Solomon-Lane to visit family and friends, *see* ECF 30-8, ¶ 9. Perysian, Orr, and Boe already cancelled international travel plans scheduled for February and March of 2025 because they were unable to obtain passports bearing sex markers corresponding to their gender identities. *See* ECF 30-3, ¶¶ 10, 13-14; ECF 65, at 27:23-28:12. Anderson and Soe risk losing opportunities for professional advancement if they also conclude that they are unable to travel with a passport that does not bear a sex marker corresponding to their gender identity. *See* ECF 30-6, ¶¶ 9, 14-15; ECF 30-9, ¶¶ 10-11.

Absent a preliminary injunction, Perysian, Orr, Anderson, Boe, Hall, and Soe will be unable to obtain passports bearing sex markers that align with their gender identity and expression. These plaintiffs will thus be required to choose between forgoing international travel plans—including the medical appointments, and academic and professional opportunities, giving rise to

those plans—or travelling with passports bearing sex markers that correspond to their sex assigned at birth. If the plaintiffs use such passports, they are likely to experience worsened gender dysphoria, anxiety, and psychological distress, and they will face a greater risk of experiencing harassment and violence. Injuries like these cannot be accurately measured or compensated by money damages or other legal remedies. The Court therefore concludes that each of these plaintiffs has demonstrated that they are likely to experience irreparable harm absent a preliminary injunction. *See Ross-Simons of Warwick*, 102 F.3d at 19 ("If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel."). Solomon-Lane, however, currently possesses a valid passport that bears a sex marker consistent with his gender identity. ECF 30-8, ¶ 11. While he would likely experience the aforementioned harms if required to travel with a passport bearing a sex marker that corresponds to his sex assigned at birth, he is not at risk of experiencing those harms while using his current passport, which does not expire until 2028. *See id.*; *see also* U.S. Dep't of State, *Sex Marker in Passports*, (last visited Apr. 18, 2025), perma.cc/B38H-QS22 ("All passports—including those with an X marker or those listing a sex different from your sex at birth—will remain valid for travel until their expiration date."). The Court thus concludes that Solomon-Lane is not likely to experience irreparable harm prior to the full adjudication of this case on the merits, and, accordingly, is not entitled to preliminary injunctive relief.

## III.   **Balance of the Equities and the Public Interest.**

The final factors, the balance of the equities and the public interest, also favor the plaintiffs. The plaintiffs have demonstrated that they are likely to face significant hardships absent a preliminary injunction, including psychological distress, lost professional and medical opportunities, and the increased risk of experiencing harassment or violence. The government

contends, in vague terms, that the injunctive relief sought by the plaintiffs will impair the State Department's ability to operate effectively, but it has not produced any evidence specifically supporting this contention. Nor does the record support such an inference. The plaintiffs seek an injunction requiring the State Department to issue them passports pursuant to the policy in effect as of January 19, 2025—i.e., to issue them passports with an "M," "F," or "X" sex marker that aligns with their gender identity. Such passports would bear sex markers that match the plaintiffs' gender expression as well as the sex markers on the plaintiffs' driver's licenses and other identity documents. *See* ECF 30-3, ¶ 9; ECF 30-4, ¶ 8; ECF 30-5, ¶ 7; ECF 30-6, ¶¶ 7, 10; ECF 30-7, ¶ 10; ECF 30-9, ¶ 8. There is no evidence that this relief, which is narrow and limited to the named plaintiffs, is likely to "impair" the State Department's effective functioning. Nor is there evidence that the State Department's functioning was impaired during the nearly three years that it processed and issued passports in precisely the manner requested by the plaintiffs. The Court accordingly concludes that the balance of the equities and the public interest support the injunctive relief sought by the plaintiffs. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994))).

**IV.    <u>Scope of Relief.</u>**

The plaintiffs request two forms of interim equitable relief: a stay of agency action issued pursuant to 5 U.S.C. § 705 and a preliminary injunction as to the individual plaintiffs issued pursuant to Rule 65(a). Section 705 provides that "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or

rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The provision codified courts' "traditional authority" to grant stays pending review of an agency action or court order. *Sampson v. Murray*, 415 U.S. 61, 68 n.15, 76 (1974). The principles governing a "traditional stay granted by an appellate court pending review of an inferior court's decision" thus also govern "the authority of courts charged by statute with judicial review of agency decisions." *Id.* at 73-74 (citing *Scripps-Howard Radio v. Fed. Commc'ns Comm'n*, 316 U.S. 4 (1942)); *see All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 255-56 (5th Cir. 2023) ("Circuit courts have interpreted [5 U.S.C. § 705] as providing something akin to the general stay power recognized by Rule 18 of the Federal Rules of Appellate Procedure." (citing *Ohio v. Nuclear Regul. Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987), and *In re GTE Serv. Corp.*, 762 F.2d 1024, 1026 (D.C. Cir. 1985))), *rev'd and remanded on other grounds sub nom. Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024).

An order staying an agency rule or policy pending full adjudication on the merits is similar to a preliminary injunction prohibiting enforcement of that rule or policy. *See Nken*, 556 U.S. at 428. "Both can have the practical effect of preventing some action before the legality of that action has been conclusively determined." *Id.* Stays and preliminary injunctions nevertheless "serve different purposes." *Id.* While an injunction "is a means by which a court tells someone what to do or not to do," a stay "operates upon the [administrative] proceeding itself" by "halting or postponing some portion of the proceeding, or by temporarily divesting [a rule or policy] of enforceability." *Id.*; *see* Stay, Black's Law Dictionary (12th ed. 2024) (defining stay as the "postponement or halting of a proceeding, judgment, or the like"). Put differently, although an agency may effectively be required to *refrain from acting* pursuant to either form of equitable

relief, an agency may only be affirmatively *directed to act* pursuant to an injunction. *See Nken*, 556 U.S. at 429.

An example offered by the Supreme Court in *Scripps-Howard Radio v. Federal Communications Commission* illustrates this distinction. There, the Court contrasted a request to stay the Federal Communications Commission's ("FCC") decision to *grant* an application to modify a radio station's broadcasting license with a request to stay the FCC's decision to *deny* such an application. *See* 316 U.S. at 14. The Court explained that while the FCC's decision to grant an application to modify a license would be "susceptible of being stayed on appeal," its decision to deny the application would not be susceptible to a stay, because "[a] stay of an order denying an application would in the nature of things stay nothing." *Id.* at 14, 16. In other words, a stay cannot "operate as an *affirmative authorization* of that which [an agency] has refused to authorize." *Id.* at 14 (emphasis added); *accord Sampson*, 415 U.S. at 76.

In their request for a stay under 5 U.S.C. § 705, the plaintiffs seek two distinct forms of relief. They first ask the Court to "stay enforcement of the [Passport] Policy during the pendency of this litigation." ECF 29, at 1. This is a prototypical example of a stay. While such an order would "have the practical effect of preventing" the government from enforcing the Passport Policy, it would achieve "this result by temporarily suspending the source of [the government's] authority to act," not by affirmatively "directing [the government's] conduct." *Nken*, 556 U.S. at 428-29. Second, the plaintiffs ask the Court to "require the Agency Defendants to process and issue passports consistent with the [prior passport policy], including permitting (i) changes to the sex designation on passports, including allowing individuals to self-attest to what their sex is, and (ii) the use of an 'X' sex designation on passports." ECF 29, at 1-2. This is a prototypical example of an injunction: the plaintiffs are requesting an order that affirmatively "directs the conduct of

[the government], and does so with the backing of [the Court's] full coercive powers." *Nken*, 556 U.S. at 428; *cf. Scripps-Howard*, 316 U.S. at 14. This latter form of relief—which would apply to "*all* processing of passport applications, renewals, or changes," ECF 67-1, at 1 (emphasis added)— is considerably broader than the preliminary injunctive relief sought under Rule 65(a), which would apply only "as to Plaintiffs," ECF 29, at 2.

The plaintiffs' latter request for affirmative relief, which is in the nature of injunctive relief rather than a stay, exceeds the scope of relief made available by Section 705. An order staying the Passport Policy would be distinct from an order directing the State Department to reinstate its prior passport policy that existed as of January 19, 2025. The plaintiffs nevertheless contend, in support of their request for affirmative relief under Section 705, that "courts routinely 'reinstate . . . rules previously in force'" when "granting APA challenges to agency action." ECF 67-1, at 2 (quoting *Georgetown Univ. Hosp. v. Bowen*, 821 F.2d 750, 757 (D.C. Cir. 1987)). It is well established that "'[w]hen a court *vacates* an agency's rules'" under 5 U.S.C. § 706(2), "the vacatur restores the status quo before the invalid rule took effect and the agency must initiate another rulemaking proceeding if it would seek to confront the problem anew.'" *Am. Great Lakes Ports Ass'n v. Zukunft*, 301 F. Supp. 3d 99, 103-04 (D.D.C. 2018), *aff'd sub nom. Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510 (D.C. Cir. 2020) (quoting *Env't Def. v. Leavitt*, 329 F. Supp. 2d 55, 64 (D.D.C. 2004)) (emphasis added); *see also United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (the effect of vacatur was to "automatically resurrec[t]" the prior standard). But vacatur of a rule or policy under Section 706 following full adjudication on the merits is distinct from an order staying a rule or policy under Section 705 pending adjudication on the merits. Thus, where courts have stayed agency action under Section 705, they have regarded any additional affirmative relief as in the nature of injunctive relief. *See, e.g.*, *Gomez v. Trump*, 485

F. Supp. 3d 145, 202-05 (D.D.C. 2020) (holding that plaintiffs established entitlement to stay of State Department's "No-Visa Policy" and, separately, to preliminary injunction requiring State Department to process certain visa applications submitted by all "eligible applicants"); *Maryland v. U.S. Dep't of Agric.*, No. 25-cv-0748-JKB, 2025 WL 800216, at *22-24 (D. Md. Mar. 13, 2025) (staying large-scale reductions of force and issuing temporary restraining order requiring reinstatement of all government workers terminated pursuant to those reductions).

The plaintiffs have not, however, affirmatively requested or explained why they are entitled to injunctive relief that extends beyond the scope of their request under Rule 65(a). Instead, they limited their request for injunctive relief to the individual plaintiffs. *See* ECF 29, at 2. The Court will, accordingly, deny the plaintiffs' request for a stay under Section 705 because it seeks affirmative relief in the nature of a preliminary injunction, and the plaintiffs have forfeited the argument that they are entitled to an affirmative injunction that would effectively reinstate the State Department's prior passport policy nationwide. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (an "injunction [should be] no broader than necessary to achieve its desired goals").

Pursuant to Rule 65(a), the plaintiffs request a preliminary injunction preventing the government from enforcing the Passport Policy and Executive Order "as applied to passports against Plaintiffs," and requiring the State Department to process and issue passports to the plaintiffs consistent with the prior passport policy. ECF 29, at 2. They specifically request an order requiring the State Department to "permit (i) changes to the sex designation on Plaintiffs' passports, including allowing Plaintiffs to self-attest to what their sex is, or (ii) an 'X' designation on any of the Plaintiffs' passports where that is requested by the Plaintiff." *Id.* The Court concludes that the plaintiffs are entitled to such relief. As discussed, the plaintiffs have established a

substantial likelihood of success on the merits of their claim that Executive Order 14168 and the Passport Policy violate their Fifth Amendment equal protection rights, and that the Passport Policy violates the APA. With the exception of Solomon-Lane, the plaintiffs are also likely to suffer irreparable harm absent a preliminary injunction, and the balance of the equities weighs in their favor. Further, the preliminary injunction requested by the plaintiffs accords with the government's position regarding the appropriate scope of relief. *See* ECF 69, at 1 ("Defendants maintain that if any relief is warranted, it should be a targeted injunction at the particular agency action held to be invalid . . . [and] limited to the plaintiffs against whom the Department is held to have taken unlawful action.").

## CONCLUSION AND ORDER

For the foregoing reasons, the plaintiffs' Motion to Stay Agency Action and for a Preliminary Injunction, ECF 29, is GRANTED IN PART and DENIED IN PART. A separate order will issue memorializing the preliminary injunction entered by the Court.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
Dated: April 18, 2025                    UNITED STATES DISTRICT JUDGE